UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **BRENDA J. DIGGS,** | ) Case No. 1:10-CV-602 |
| Plaintiff, | ) Judge Dan Aaron Polster |
| vs. | ) **MEMORANDUM OF OPINION** |
| | ) **AND ORDER** |
| **JOHN E. POTTER,** | ) |
| **POSTMASTER GENERAL,** | ) |
| **UNITED STATES POSTAL SERVICE,** | ) |
| Defendant. | ) |

Before the Court is Defendant John E. Potter's Motion for Summary Judgment (**Doc. # 23**) on Plaintiff Brenda Diggs's two-count complaint (Doc. # 1), which alleges race discrimination, in violation of 42 U.S.C. § 2000e-2, and retaliation, in violation of 42 U.S.C. § 2000e-3.

Plaintiff filed an opposition (Doc. # 29) to Defendant's motion, and Defendant in turn filed a reply (Doc. # 33). Defendant included in and attached to his reply brief new evidence and new arguments, so the Court afforded Plaintiff an opportunity to submit a surreply, which she did. (See Docs. # 34, 35).

**I. Background**

Plaintiff, an African-American woman, began working for the United States Postal Service ("USPS") in 1988 as an Occupational Health Nurse at the Orange Avenue Main Post Office in Cleveland, Ohio. She worked there for 17 years until she was fired. Her last day was July 8, 2005.

The health unit provides medical treatment to postal employees for on-the-job injuries and illnesses, coordinates health care programs for the Postal staff, and screens new employees

to ensure they are fit to work.  During the relevant time period—i.e. the last few years of Plaintiff's employment—the health unit employed five career nurses—Plaintiff, three other African-American women, and one Caucasian man—and a handful of contract nurses.  Career nurses are members of the National Professional Postal Nurses Union and are subject to the terms of a collective bargaining agreement.  Contract nurses, on the other hand, are hired for two-year periods, are not union members, and are not subject to the terms of that agreement.  The health unit is supervised by an Occupational Health Nurse Administrator, who oversees the day-to-day operations of the unit and manages the nursing staff.  Plaintiff had several supervisors throughout her employment.  Her last supervisor—the one who recommended her termination—was Mary Muzica.

Muzica, a Caucasian woman, was hired in February of 2002.  Initially, she and Plaintiff had a cordial and professional relationship; gradually, however, the relationship soured.  Plaintiff did not like the way Muzica managed her staff.  She saw Muzica as a micro-manager with a "crack the whip type of style."  (Doc. # 24-1 at 39).  Plaintiff felt singled out for discipline and that "everything that [Muzica] questioned me about, it was always something bad, nothing ever good that I done.  It was nothing where I ever got praise for doing a good job."  (Doc. # 24-1 at 39).

In March 2003, about a year after Muzica joined the health unit, Plaintiff filed with the USPS an Equal Employment Opportunity ("EEO") charge[1] against Muzica, alleging discrimination based on race, age, and religion as well as retaliation for prior union grievances.  Three months later, on her way to a meeting about the EEO charge, Muzica warned Kathleen Nash, another nurse, about Plaintiff: "Be careful of her.  Brenda can cause trouble.  She has filed

---

[1]The USPS is required by law to process and handle Equal Opportunity Employment complaints internally.  See 29 C.F.R. § 1614.

EEO complaints." (Doc. # 29-8 at 2).[2] Muzica expressed her frustration with the EEO file, which, Muzica told the nurse, "was several inches thick because of the complaints [Plaintiff] had filed." (Id.). Five months later, on December 1, 2003, Muzica issued Plaintiff a formal letter of warning.

The warning letter lists four reasons for the discipline: failure to follow instructions; failure to perform the duties of the position conscientiously and effectively; failure to practice nursing with reasonable skill and safety; and conduct unbecoming of a Postal employee. According to the letter, Plaintiff committed several errors while performing a Testcup procedure—a drug test performed on prospective Postal employees—by omitting key information, such as Social Security numbers, expiration dates, and specimen ID numbers.

In addition, the letter states, Plaintiff exhibited a "lack of urgency to respond to a medical emergency" on numerous occasions and made employees wait while she talked on the phone. (Doc. # 29-13 at 2). Several of the employees complained to Muzica about Plaintiff, including a contract nurse, who was "visibly very upset." (Id. at 5). The nurse came to Muzica "sobbing, complaining of chest pain, shaking." (Id.). The nurse reported that Plaintiff was verbally abusive to her in front of others and made rude remarks. (Id. at 5). Muzica also received complaints about Plaintiff always being on the phone, cancelling appointments, turning away employees, and frequently making unsolicited, negative remarks to the detriment of staff morale. Plaintiff also acted rudely toward Muzica:

> [I]f I do not agree with you or try to give you instruction, you begin to raise your voice in an attempt to talk over me, demonstrate your outbursts without regard to who is present in the Health unit, and when you are done talking "at" me you begin to walk away from me whether or not the conversation is over.

(Id.).

---

[2]Defendant, in his reply, seeks to undermine Nash's statements by showing that Plaintiff did not have an open EEO complaint at the time Nash made her statements. In a summary judgment motion, however, the Court is not to weigh competing versions of the facts; instead, the Court views the facts in a light most favorable to the non-moving party. Here that means Nash's statement—that Muzica was on her way to a meeting to address one of Plaintiff's EEO complaints—is taken as true, notwithstanding Defendant's evidence to the contrary.

On March 1, 2004, a few months after Muzica issued the warning letter, Plaintiff filed another EEO complaint, once again alleging race-based discrimination and retaliation.  Two weeks later, on March 15, Muzica issued Plaintiff a seven-day suspension for conduct unbecoming of a Postal employee, failure to follow instructions, and failure to perform duties of the position conscientiously and effectively.  Muzica cited an incident that occurred on February 19, when Plaintiff questioned an assignment that had been given to a fellow nurse.  According to several employees, Plaintiff displayed behavior that was argumentative, confrontational, loud, disruptive, inconsiderate, and unprofessional.  The suspension letter also noted that Plaintiff repeatedly failed to follow Muzica's instructions.

On April 2, Plaintiff filed an EEO complaint, citing retaliation as the motive for the suspension and listing race as a factor influencing Muzica's actions.  Plaintiff filed another EEO charge in November.

On December 7, 2004, Muzica issued Plaintiff a 14-day suspension.  The suspension was based on Plaintiff's repeated failure to perform correctly the Testcup procedure.  Muzica claimed to have found seven Testcup specimens that were sent to the lab without the necessary information.  Plaintiff subsequently filed two more EEO complaints, one in March and another in April of 2005.

On June 2, 2005, Muzica issued the last of the disciplinary actions—a notice of removal, officially discharging Plaintiff from her job effective July 8.  The bases of the termination were Plaintiff's progressive discipline—the letter of warning and two prior suspensions—in combination with her personal internet usage, which caused Plaintiff to neglect her professional responsibilities.

Prior to Plaintiff's termination, Muzica had ordered an investigation by the Office of Inspector General ("OIG") into Plaintiff's internet use.  The investigation revealed that, from September through December of 2004, Plaintiff used the internet for nearly 19 hours for personal matters.  The investigation further revealed that Plaintiff was using her computer and the internet

for personal reasons while current and prospective employees waited and that, on several occasions, Plaintiff required assistance from a fellow nurse because she fell behind on her work: "There were many times you complained about the workload yet you took time away from performing your duties, to utilize the Postal computer for personal reasons. Your time on the computer for personal reasons is a factor in your time management." (Doc. # 31-6 at 2).

Plaintiff repudiates Muzica's attempts to characterize her "as a poor performer with a bad attitude and a habit of violating workplace rules...." (Doc. #29 at 7). According to Plaintiff, "the evidence paints a different picture." (Id.). To rebut Defendant's portrayal of her, Plaintiff has submitted signed declarations from five Postal employees, all of whom speak of Plaintiff in laudatory terms. Plaintiff also rejects the idea that either the Testcup errors or her computer use justified her discipline and ultimate termination, arguing that the USPS has a permissive work culture in which employees are rarely disciplined.

Plaintiff believes she was targeted for discipline because of her race and in retaliation for filing EEO complaints. After she was fired, Plaintiff pursued her EEO complaints through the USPS's formal complaint process, was eventually issued a right to sue letter on December 22, 2009,[3] and timely filed the instant lawsuit.

**II. Standard of Review**

Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must examine the evidence and draw all reasonable inferences in favor of the nonmoving party. Jones v. Potter, 488 F.3d 397, 402–03 (6th Cir. 2007). If, after reviewing the record as a whole, a rational factfinder could not find for the nonmoving party, summary judgment is appropriate since there is no genuine issue of material fact for determination at trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

---

[3]The administrative process lasted more than four years.

574, 587 (1986). The guiding question is this: Does the evidence present a sufficient disagreement that requires submission to a jury or is the evidence so one-sided that one party must prevail as a matter of law? Id. at 403.

**III. Analysis**

A. Race Discrimination

An employer is prohibited from discriminating against an employee because of the employee's race:

> It shall be an unlawful employment practice for an employer...to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race....

42 U.S.C. § 2000e-2(a).

To make out a prima facie case of race discrimination, a plaintiff must show: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently than a similarly-situated employee outside her protected class. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006). Only elements three and four are in dispute. The Court will begin by addressing the fourth element.

To satisfy the similarly-situated-but-treated-differently requirement, a plaintiff must show that the comparable employee is similar in all of the relevant aspects. Barry v. Noble Metal Processing, Inc., 276 Fed. Appx. 477, 480 (6th Cir. 2008) (citing Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)). The focus is on whether the plaintiff and the comparable employee: have the same supervisor; are subject to the same standards; and have engaged in the same conduct "'without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Barry, 276 Fed. Appx. at 480–81 (quoting Ercegovich, 154 F.3d at 352).

Plaintiff argues that several Caucasian contract nurses qualify as similarly-situated employees. But Plaintiff does not present any evidence that these contract nurses engaged in the

same conduct as she: argumentative and confrontational behavior; neglecting employees that were seeking treatment; failure to complete assignments on time; or use of Postal computers at the expense of their professional responsibilities. In fact, Plaintiff has produced no evidence whatsoever that any contract nurse engaged in any unprofessional conduct.

There is, however, another employee who Plaintiff argues was similarly situated, treated differently, and outside her protected class. Tom Hofer, a Caucasian man, was a career nurse in the Health Unit until he resigned in late 2004. Like Plaintiff, Hofer was supervised by Muzica and, both parties agree, was subject to the same standards as Plaintiff. The only question, then, is whether Hofer and Plaintiff engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." "In order for conduct of a comparable employee and the Title VII plaintiff to be considered the 'same conduct,' it must be similar in kind and severity." Barry, 276 Fed. Appx. at 483 (citing Clayton v. Meijer, Inc., 281 F.3d 605, 611 (6th Cir. 2002)).

The evidence shows that Hofer engaged in similar misconduct—or at least conduct similar in kind and severity—as Plaintiff. In late October and November of 2004,

> Tom Hofer (1) failed to timely complete his [T]estcup training, (2) acted in an "inappropriate" fashion when he used a loud voice and a demeanor of authority to inform co-workers about testcup scheduling (a topic about which he had no authority to make pronouncements), and (3) began performing [T]estcup drug tests despite not being authorized to do so.

(Doc. # 29 at 24). Plaintiff contends that, even though Hofer engaged in this misconduct, he received no discipline.

To the contrary, Hofer *was* disciplined. On October 26, 2004, around the time he failed the Testcup procedure, Muzica sent him a lengthy e-mail admonishing him for making an inappropriate comment and for failing to complete the Testcup procedure in accordance with her instructions. (Doc. # 33-1 at 18). That same day, Hofer tried but failed to correctly administer a Testcup. (Id. at 2). Then, on November 12, 2004, Muzica sent him an e-mail, notifying him that he was scheduled for a pre-disciplinary interview to address his failure to follow instructions,

-7-

conduct unbecoming of a Postal employee, failure to perform the duties of his position conscientiously and effectively, and attendance issues.  (Id. at 24).  Altogether, during November and December of 2004, Hofer was subjected to one informational meeting and two pre-disciplinary interviews.  (Doc. # 35 at 2).  The only reason Hofer was not further disciplined was because he resigned on December 14, 2004.  (Docs. # 33-1 at 4; # 35-2).

Plaintiff has attached to her surreply a long, 19-page letter written by Hofer shortly after he resigned.  (Doc. # 35-1).  Hofer, flush with indignation, complains about Muzica, one he regarded as having a "Type A personality" who sought to "aggrandize herself" and  "micro-manage the nurses," which she apparently "facilitated by an adroit political maneuver...wherein she was able to have her office moved...directly behind the nurse station."  (Id. at 1–2).  Hofer believes he was "subjected to unusual scrutiny by Mary Muzica"—including "an unusual number of punitive meetings"; he claims "no other nurse underwent" as many evaluations as he.  (Id. at 1, 8).  To his mind, Muzica was "inconsistent and contradictory," "established a trend of criticizing my clinical judgment," was "intrusive, irksome, unjustified, demeaning, punitive, and discriminatory," and showed hostility toward him.  (Id. at 2, 6, 13).

While the evidence shows that Muzica was a strict leader with a stern demeanor, she at least treated Plaintiff and Hofer the same—she demanded of them the same level of obedience, acted with the same level of impatience, and ruled with the same iron fist.  Once Muzica learned of their misconduct, especially their Testcup failures, she instituted disciplinary action immediately: when Plaintiff's Testcup failures came to light, Muzica issued a warning letter; when Hofer's failures came to light, Muzica disciplined him in a similar manner.

Maybe Plaintiff thinks she was treated differently because she received a 14-day suspension in December 2004 for Testcup failures.  But that ignores the fact that she had been disciplined a year earlier for the same problem and had developed a bad track record—that is, the suspension was progressive discipline for worsening conduct.  If Hofer had stayed on as a nurse, continued to commit the same offenses as Plaintiff, and accumulated a long record of

-8-

misconduct but received no additional punishment, then a colorable argument could be made that Muzica had treated Plaintiff and Hofer unfairly. That, of course, is not the case here. Muzica treated them the same.

Because Plaintiff cannot satisfy the fourth element, she cannot establish a prima facie case of race discrimination. Accordingly, the Court must grant summary judgment in favor of Defendant on the race discrimination claim.

### B. Retaliation

Plaintiff also alleges she was suspended and terminated in retaliation for her several EEO complaints. Title VII prohibits an employer from retaliating against an employee for filing an EEO charge:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees...because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

42 U.S.C. § 2000e-3(a). A plaintiff may establish unlawful retaliation by adducing either direct or circumstantial evidence. DiCarlo v. Potter, 358 F.3d 408, 414, 420 (6th Cir. 2004). Plaintiff contends that both direct and circumstantial evidence of retaliation exist in this case.

Plaintiff cites as direct evidence of retaliation the comment made by Muzica in June 2003 to nurse Nash: "Be careful of her. Brenda can cause trouble. She has filed EEO complaints." (Doc. # 29-8 at 2). Plaintiff contends, "This comment by decision-maker Mary Muzica constitutes direct evidence of retaliation...." (Doc. 29 at 12). The Court disagrees; that is not direct evidence of retaliation.

Direct evidence is evidence that, if believed, *requires* the conclusion that unlawful retaliation was a motivating factor in the employer's action; it proves the existence of a fact without any inferences or presumptions. Abbott v. Crown Motor Co., 348 F.3d 537, 542 (6th Cir. 2003) (original emphasis). An example of direct evidence is where a supervisor says, "I fired the plaintiff because she filed an EEOC charge," or "I'm going to get back at her for filing

that EEOC charge." If the comment is true, it follows, perforce, that unlawful retaliation motivated the supervisor's action. Muzica's comment, if true, does not lead inexorably to the conclusion that unlawful retaliation motivated her actions. In addition, a substantial period of time elapsed between Muzica's comment to Nash and Muzica's first discipline of Plaintiff—five months. And more than two years elapsed before Muzica terminated Plaintiff, further weakening any evidentiary connection between Muzica's comment to another employee and any disciplinary action taken against Plaintiff.

Muzica's comment, if true, shows that she was conscious of Plaintiff's EEO filings and that she didn't like the fact that Plaintiff had filed them. Further inferences, however, are required to reach the conclusion that Plaintiff's protected activity motivated Muzica to discipline Plaintiff. Accordingly, there is no direct evidence of retaliation in this case.

### i. Prima Facie Case

When there is no direct evidence, the McDonnell Douglas burden-shifting framework applies. DiCarlo, 358 F.3d at 414 (citing McDonnell Douglas, 411 U.S. at 802). To make out a prima facie case of retaliation under the burden-shifting framework, a plaintiff must show by a preponderance of the evidence that: (1) she engaged in activity protected by Title VII; (2) the defendant knew she engaged in the protected activity; (3) the defendant subsequently took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. Arendale v. City of Memphis, 519 F.3d 587, 606 (6th Cir. 2008). "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). The parties dispute only the last element, a causal connection between the protected activity and the adverse employment action.

The Sixth Circuit has held that "the combination of close temporal proximity between an employer's heightened scrutiny and that plaintiff's filing of an EEOC charge is sufficient to establish the causal nexus needed to establish a prima facie case of retaliation." Upshaw v. Ford

Motor Co., 576 F.3d 576, 588 (6th Cir. 2009) (internal citations omitted). Because the plaintiff's burden of proof at the prima facie stage is minimal, "all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the protected activity and the retaliatory action." Id. In Hamilton v. GE, the Sixth Circuit found that the temporal proximity of less than three months combined with increased scrutiny of the plaintiff's work after he filed an EEOC complaint was sufficient to establish the causation element. 556 F.3d 428, 436 (6th Cir. 2009).

Here, there are three adverse employment actions: a seven-day suspension, a 14-day suspension, and termination.[4] The seven-day suspension was issued on March 15, 2004, 14 days after Plaintiff filed her March 1, 2004, EEO complaint. The 14-day suspension occurred in December 2004, one month after Plaintiff filed her November 2004 EEO complaint. And the termination letter was given on June 2, 2005, two months after Plaintiff filed her April 2005 EEO complaint. In sum, the temporal proximity for each adverse action was less than three months.

In addition, Plaintiff presents evidence of heightened scrutiny, including being singled out for an investigation of computer use in an otherwise permissive work culture, where employees are rarely disciplined and even more rarely terminated. And Plaintiff offers the statements of her supervisor, Muzica, who complained about Plaintiff's protected activity. If summary judgment on the element of causal connection was inappropriate in Hamilton, it would be even less appropriate here. Accordingly, the Court concludes that Plaintiff has made out a prima facie case of retaliation.

### ii. Articulated Reason for Adverse Actions

After a plaintiff establishes a prima facie case, the burden of production shifts to the

---

[4]The parties do not explicitly say so, but their arguments appear to operate under the assumptions that the letter of warning, dated December 1, 2003, was not an adverse employment action but that the two suspensions and termination were. The Court will likewise operate under those same assumptions.

defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Upshaw, 576 F.3d at 584.  Defendant offers the following explanation for the adverse employment actions:

> Defendant has a legitimate business interest in ensuring that employees observe the rules, regulations, policies, and procedures of the USPS.  Specifically, in this case, Defendant has a legitimate business interest in ensuring that Plaintiff's conduct was acceptable in the workplace and that she performed the job duties of an OHN in a professional and timely manner.  Defendant attempted to gain conformity through progressive discipline.

(Doc. # 23-1 at 22).

Plaintiff does not dispute that these reasons are legitimate and non-discriminatory; instead, Plaintiff contends they are pretextual.

### iii.  Pretext

After a defendant meets its burden of production, the plaintiff must rebut the proffered reasons by showing they were not the defendant's true reasons but were pretextual.  Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  A plaintiff may show that the defendant's articulated reasons for its employment action were pretextual by showing that they (1) had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) are insufficient to explain the challenged conduct.  Upshaw, 576 F.3d at 586.

Plaintiff attempts to rebut Muzica's characterization of her as unpleasant and truculent by presenting the testimony of fellow nurses and Postal employees.  One nurse considered Plaintiff a "good worker, very helpful, and quite calm" and never witnessed her cause any trouble.  (Doc. # 29-8 at 2).  Another nurse found Plaintiff to be "generally pleasant and that she did her job well."  (Doc. # 29-12).  This nurse got along well with Plaintiff and "often asked her job-related questions, which [Plaintiff] always answered."  (Id.).  A technician with over 41 years of service interacted with Plaintiff on several occasions and found her to be "very kind and professional.  She had excellent people skills, was very attentive to my needs, and was very compassionate.  I thought that she did her job very well and she helped me feel better during my visits to her."

(Doc. # 29-9). A mail carrier with over 23 years of experience praised Plaintiff for being very helpful, always being calm, and "polite with a sympathetic ear." (Doc. # 29-10 at 3).

Plaintiff even offers testimonials of Postal employees to suggest it was Muzica, rather than Plaintiff, who was rude and irascible. In 2003, a Postal clerk was sitting in the lobby of the health unit when Plaintiff's supervisor, "a Caucasian female (whose name I do not recall) walked out of her office and berated Brenda in front of a patient. This supervisor was bullying Brenda Diggs and acting as if Brenda was incompetent. I was disturbed by this abusive behavior." (Doc. # 29-16). Another nurse also complained about Muzica:

> I found that Mary Musica [sic] did not like to be challenged, and that she would become easily upset if someone crossed her....In her interactions with Ms. Diggs, Ms. Musica [sic] was abrupt and adversarial. I found Ms. Musica [sic] to be more abrupt and adversarial with Ms. Diggs than she was with other nurses in the unit, or with the secretary.

(Doc. # 29-8 at 2).

While it may be true that many staff members liked Plaintiff better than Muzica, this is not a popularity contest. The issue is whether Plaintiff has produced enough evidence to call into question Defendant's proffered reasons. With one exception, Plaintiff has not offered any evidence that the specific instances of misconduct described by Muzica in the disciplinary letters—and that form the basis of the adverse employment actions—are untrue.

In the letter of warning Muzica writes, "I receive daily verbal reports from all staff (both [P]ostal & contract) complaining that you are 'always on the phone,' 'doing your own thing,' and making unsolicited negative remarks about what is or is not your job...and canceling appointments or turning employees away when you are 'too busy' to see them." (Doc. # 29-13 at 4). Plaintiff does not deny this.

The letter of warning also describes an incident that occurred on September 29, 2003, when Plaintiff "failed to respond to a medical emergency in the plant...involving [an] employee." (Id.). In the letter, Muzica provides details of the incident, including the date, the name of the employee who complained about Plaintiff to Muzica, and the name of the employee who was

-13-

injured. (Id. at 3). Plaintiff does not deny the incident generally or the details specifically.

On October 30, 2003, Plaintiff ignored an employee who came to the Health Unit with a sprained ankle from an injury on the job. (Id.). Muzica, again, provided a number of details, including the time of the incident, the name of the employee with the sprained ankle, and other nurses who were in the Health Unit at the time. (Id.). Plaintiff denies none of these allegations.

Given that Muzica provided specific information, including the names of the complaining employees and the dates of the incidents, Plaintiff could have deposed the employees to question the veracity of the reports. She elected not to do so. She instead relies on the favorable testimony of former co-workers to characterize her in broad strokes and sweep aside the specific—and many—instances of unprofessional conduct.

The only allegation Plaintiff denies outright is an incident recounted in the seven-day-suspension letter. The letter describes an incident in which Plaintiff allegedly raised her voice at another Health unit employee, Barbara Dennstedt. (Doc. # 29-14 at 1-2). Plaintiff "flatly denies confronting or raising her voice at Ms. Dennstedt." (Doc. # 29 at 16). The only evidence Plaintiff offers is her own self-serving testimony.

Plaintiff also objects to Defendant's reliance on Testcup errors. Plaintiff argues that her failure to properly complete the Testcup procedures is misplaced because "Muzica directed Plaintiff to continue to train employees in [T]estcup procedures throughout 2004, despite her alleged deficiencies." (Doc. # 29 at 20). Plaintiff contends, "[i]t lacks sense that Mary Muzica would formally discipline Plaintiff for improper test cup procedures in December 2003, then trust Plaintiff to train other nurses in these same procedures for nearly an entire year before again raising this issue in her December 2004 fourteen-day suspension." (Doc. # 29 at 21).

There is no evidence that Muzica directed Plaintiff to train employees in Testcup procedures. But Plaintiff points to paragraph seven of her declaration. That paragraph reads in its entirety:

> While employed by the USPS, I began performing drug test [T]estcup procedures in or around 1989, and trained many employees in these procedures until

-14-

> November 2004.  I specifically recall training Tom Hofer on [T]estcup procedures in November 2004.

(Doc. # 29-18).  Nothing in that paragraph indicates Muzica directed Plaintiff to train employees.

Plaintiff also offers a letter written by Hofer in which he writes that "On or about 11/10/04, Mary Muzica had me observe [Plaintiff] in the drug Test-cup procedure, as part of my training."  (Doc. # 35-3 at 1).  While Plaintiff uses this statement to undermine Muzica's reliance on Plaintiff's Testcup failures as a basis for disciplinary action, the statement is tenuous evidence.  And even if it proves Muzica told Plaintiff to train Hofer, it does not disprove—or call into question—the fact that Plaintiff had repeatedly failed the Testcup procedures.  What's more, Plaintiff does not deny she repeatedly failed the Testcup procedure.  In short, Plaintiff has not produced enough evidence that Muzica's reliance on her Testcup failures had no basis in fact.

Furthermore, Plaintiff has not produced evidence that her repeated failure to properly perform a Testcup procedure was insufficient to justify disciplinary action or that this conduct did not actually motivate Muzica.  Muzica noted in the 14-day-suspension letter that failure to properly complete a Testcup potentially places the USPS "in legal liability by possibly adultering [sic] specimens by the collector."  (Doc. # 29-15 at 2).  The only other nurse who failed the Testcup procedure, Hofer, was promptly set up for discipline.  The evidence concerning Hofer shows that Muzica took Testcup procedures seriously—as well she should have—and that she consistently reprimanded nurses who failed them.[5]

Finally, Plaintiff rejects the notion that her computer usage justified her termination.  The computer investigation, which was conducted by the OIG at Muzica's behest, revealed Plaintiff used work computers for personal reasons for an average of 15 minutes per day over the course of four months.  It is true that the USPS permits the limited personal use of work computers, and it is true that no other employee was terminated for using work computers for personal reasons.

---

[5]That being said, it was not the Testcup failures alone that explain the 14-day suspension but the Testcup failures *in combination with* Plaintiff's previous violations, as reflected in her warning letter and seven-day suspension.

-15-

But it is not true that Plaintiff was fired *merely* for using her computer for personal reasons; the reasons for her termination were cumulative and far more egregious.

The termination letter shows that on multiple days, Plaintiff was paid overtime to complete her work, even though each of the days she had time to use the internet for personal reasons.  On September 1, 2004, even though Plaintiff spent 18 minutes on the internet for personal use, she charged 10 minutes of overtime for not completing her work by 4:30PM. (Doc. # 31-6 at 3).  On October 28, 2004, Plaintiff was paid for 50 minutes of overtime even though she had spent about a 90 minutes on the internet for personal reasons.  (Id. at 4).  On October 29, 2004, another nurse had to work overtime in order to assist Plaintiff, who had spent 30 minutes on the internet that day for personal use.  (Id. at 3).  On November 10, 2004, Plaintiff was paid an hour of overtime, even though she spent 22 minutes of that hour completing an online course.  (Id. at 4).

In addition, Plaintiff's personal internet use had an adverse effect on her own work and the operations of the Health Unit.  "Employees and applicants have been waiting for you while you were on the computer."  (Id. at 2).  "On several occasions you required additional assistance from Barbara Dennstedt...and me because you fell behind in your work."  (Id.).  And "[t]here were many times you complained about the workload yet you took time away from performing your work duties, to utilize the Postal computer for personal reasons."  (Id.).

Instead of denying these specific instance of misconduct, Plaintiff offers a vague dismissal: "[W]ebsites *may* have been open but not viewed by Plaintiff, or open on a window that was not displayed on her computer screen."  (Doc. # 29 at 19) (emphasis added).  When given the opportunity to explain herself to Muzica at the pre-termination interview, she chose not to do so:

> When asked questions regarding your computer usage and the OIG report, you stated in the presence of Ms. Mitchell and Ms. Dennstedt that "I have no comment," "I have nothing to say," "I have no answer," "I don't know, you have the report," "I never admitted to anything," "I have nothing to add."

-16-

(Doc. # 31-6 at 2).[6]

In short, it was not Plaintiff's personal internet use *per se* that constituted the misconduct; it was that she used the internet for personal use to the detriment of her professional responsibilities and at the expense of the USPS, which essentially paid her overtime to use company resources for personal reasons.

Most importantly, as the letter of termination reflects, Plaintiff's discharge was the culmination of a year-and-a-half of progressive, well-documented discipline for serious misconduct. Plaintiff demonstrated a pattern of neglect, misusing government property, and putting her fellow employees and the USPS in jeopardy. Perhaps Muzica and Plaintiff had a clash of personalities. But that is of no moment, because Plaintiff has failed to produce evidence from which a reasonable jury could conclude that Muzica's stated reasons for discipline were pretextual.

**IV. Conclusion**

Accordingly, the Court **GRANTS** Defendant's motion for summary judgment (**Doc. # 23**).

**IT IS SO ORDERED.**

                                    */s/ Dan A. Polster 2/29/12*
                                    **Dan Aaron Polster**
                                    **United States District Judge**

---

[6]Plaintiff even refused to acknowledge receipt of the termination letter by signing it.